# Exhibit B

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

AMRU HASHEM,
     Plaintiff,

vs

                               Case No.
                               HON.

R3 EDUCATION INCORPORATED, *dba* as Medical University
Of the Americas,
     Defendants.

17-008045-CB

FILED IN MY OFFICE
WAYNE COUNTY CLERK
5/30/2017 11:44:58 AM
CATHY M. GARRETT

_____/

Mohammed Abdrabboh (P61989)
Co- Counsel for Plaintiff
1360 Porter Street, Suite 275
Dearborn, MI 48124
(313) 582-5800
mabdrabboh@hotmail.com

Azzam E. Elder (P53661)
Co- Counsel for Plaintiff
1360 Porter Street, Suite 250
Dearborn, MI 48124
(313) 879-0355
azzam.elder@gmail.com

_____/

## MOTION FOR AN EMERGENCY TEMPORARY RESTRAINING ORDER, SHOW CAUSE ORDER AND PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT

Plaintiff, Amru Hashem by and through his attorneys, Mohammed Abdrabboh and Azzam Elder requests that this Court immediately issue a Temporary Restraining Order and an Order to Show Cause why a Preliminary Injunction should not be issued pursuant to MCR 3.310 for the following reasons and those outlined in its Verified Complaint and in the attached Brief In Support:

## INTRODUCTION

An emergency TRO is warranted based on the facts in the Verified Complaint and this Brief, immediate and irreparable injury will occur to Plaintiff from any further delay required to effect notice or from the risk that notice itself will precipitate even more adverse action by the

Defendants.  Plaintiff's goal in this motion is to maintain the status quo pending a final hearing regarding the parties' rights.

1.      Plaintiff has filed suit against Defendant alleging the following claims:  Count I Breach of Contract; Count II Plaintiff seeks a permanent injunction.

2.      Plaintiff's claims in his verified complaint include requests for equitable and legal relief.

3.      **Plaintiff's request for emergency injunctive relief is necessary in order to prevent Defendant from continuing to unlawfully prevent Plaintiff from taking his Epidemiology test at the Medical University of the Americas ("MUA") which is being administered on June 1, 2017 before Associate Professor Dr. Karun Dev Sharma.  Plaintiff is unable to sit for this exam because he was wrongfully dismissed from the Epidemiology course on May 23, 2017 because of 'too many absences,' a stated reason that is not only patently false but easily disprovable as attached herein by way of MUA official attendance roster (Exhibit D).  If Plaintiff is not reinstated into the aforementioned course pending the outcome of this litigation, he will be required to retake the course which will cause the following irreparable harm: 1.) Plaintiff will lose approximately 4 months because Epidemiology is a prerequisite for advancing to the next semester 2.) Plaintiff will not complete his degree with many of the medical school classmates he entered with 3.) Plaintiff will already be burdened by the stigma of being a foreign medical graduate, having a "WF" on his transcript and having to retake a basic course as elementary as Epidemiology will ensure he will never 'match' for a medical residency program in the United States, especially cardiology 4.) Plaintiff's good name for academic integrity and responsibility among his peers will remain suspect**

4. The objective of a preliminary injunction is to maintain the status quo pending a final hearing regarding the parties' rights. *Michigan AFSCME Council 25 v Woodhaven-Brownstown School Dist*, 293 Mich. App. 143, 145; 809 NW2d 444 (2011).

5. For the above-stated reasons and those outlined in his Verified Complaint and the attached Brief in Support, Plaintiff request that this Court immediately issue a Temporary Restraining Order and an Order to Show Cause why a Preliminary Injunction should not be issued pursuant to MCR 3.310.

6. Plaintiffs request that this Court immediately order the following:

   a. That Plaintiff Amru Hashem be reinstated into his Epidemiology class at the Medical University of the Americas ("MUA") so that he may conclude his medical education unimpeded; and

   b. temporary and permanent injunctive relief preventing Defendant, MUA and any of their employees, agents or assigns, from harassing, retaliating, or conducting themselves in any ill manner towards Plaintiff during the pendency of this litigation.

   c. MUA make reasonable accommodation with Plaintiff to make up exams and class work missed due to their wrongfully dismissal of Plaintiff

7. Plaintiff requests that this Court an immediate ex parte Order as outlined above and set a show cause hearing.

Dated: May 30, 2017

Respectfully Submitted,

/s/ Mohammed Abdrabboh (P61989)
Counsel for Plaintiff

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### I.      INTRODUCTION

Plaintiff and medical student Amru Hashem, seeks an emergency temporary restraining order (TRO) in order to prevent Defendant R3 Education Inc. from continuing to unlawfully prevent Plaintiff from taking his Epidemiology course at the Medical University of the Americas ("MUA"), a course which concludes on June 1, 2017 (course final exam date) taught by Associate Professor Dr. Karun Dev Sharma.

Plaintiff is medical student at MUA who has never had attendance issues while enrolled at MUA. In fact after the current semester concludes, Plaintiff will have earned 95 credits with only 65 remaining for graduation.  On May 23, 2017 Plaintiff was summarily and illegally dismissed by the Defendant R3 Education Inc. ("R3") who's agents and employees at MUA acted in concert with one another to that end.

Plaintiff has sacrificed enormously, worked extremely hard and has overcome insurmountable odds to achieve his success to date. He has successfully completed everything required of him thus far in order to achieve his dream of becoming a practicing physician in the United States. Plaintiff seeks an emergency TRO in order to preclude Defendant's conduct from blocking his career permanently as a cardiologist because no post medical school residency

program in the United States will accept Plaintiff as a 'match' for the competitive cardiology

residency or any other medical residency because of the nature and manner in which Plaintiff

was dismissed from MUA's Epidemiology course. Plaintiff would have to explain why he

effectively failed a basic course like Epidemiology, and explain why he was set back an entire

semester from a foreign medical school. Without the issuance and grant of this TRO, all of

Plaintiff's sacrifice, years of educational efforts and hundreds of thousands of dollars in

educational expenses will be rendered meaningless and will be wasted. Any redo of the course or

a transfer elsewhere would never remove the false academic/honor code blemishes MUA has

imputed permanently on Plaintiff record that will follow him wherever he pursues residency

and/or employment upon graduation. This request for TRO is based on the allegations set forth

in Plaintiff's Verified Complaint, Motion for TRO and Brief in Support.

## II.  STANDARD OF REVIEW

MCR 3.310 governs the procedure for issuing a preliminary injunction. Injunctive

relief is an extraordinary remedy that issues only when justice requires, there is no adequate

remedy at law, and there exists a real and imminent danger of irreparable injury. *Jeffrey v*

*Clinton Twp*, 195 Mich App 260, 263-64 (1992).

## III.  BACKGROUND

In May of 2016 Plaintiff earned his way into the Medical University of the Americas

("MUA"), a medical school owned and administered by Defendant R3 Educational Inc. ("R3")

Prior to his departure for MUA, Plaintiff entered into an agreement (hereinafter "Contract") with

MUA which amongst other relevant items included an agreement to abide by MUA Student

Handbook (hereinafter "Handbook"). The Handbook (**Exhibit B**) purports to govern

expectations of students, staff and outlines procedures in the event certain instances occur.

Students are required to take certain specific courses in an orderly manner, and pass them prior to taking other courses or moving ahead to the next semester. Epidemiology is in fact a course while relatively remedial compared to other subjects encountered in medical school, MUA requires Epidemiology before a student can move on to the next semester.

Among other contractual guarantees R3 is bound by, the Handbook clearly outlines two policies indispensable and central to Plaintiff's cause of action, MUA's written policy on class absences and the related consequences and grievance procedures should a student disagree with any action taken by MUA relating to missed classes (**Exhibit B, page 8**).

In relevant portions, page 18 of the Handbook states that no student shall be absent for more than 20% of any single course.

When Plaintiff accepted the offer to enroll at MUA in May of 2016, Plaintiff had a legal and contractual right to be treated fairly, with due process and was permitted to miss up to 20% of any given course for any reason.  On or about May 23rd 2017 Plaintiff was fully prepared to take his mid-term exam, not saying anything and with only gestures, Associate professor of Epidemiology, Dr. Karun Dev Sharma directed Plaintiff towards Associate Dean Dr. Crum. Dr. Crum escorted Plaintiff outside of the testing center where he advised Plaintiff he would be forcibly withdrawn from Epidemiology. Initially Plaintiff believed Dr. Sharma erred and perhaps misidentified Plaintiff due to the large amount of students in the Epidemiology course. Dr. Crum didn't provide anything written to Plaintiff, didn't provide notice of any kind, he simply advised Plaintiff that "there is nothing you can do about it, you're done in this class." Shocked, Plaintiff frantically asked why, Dr. Crum advised that it was because of "too many absences." Plaintiff advised Dr. Crum that he only missed three classes in total and two, possibly two and a half were excused because Plaintiff suffered bowel movements so severe he had blood in his stool, Plaintiff

also had medical documentation and a medical note to support his position and the same was in fact approved by MUA's administration. Rather than engage or explain his position to Plaintiff, Dr. Crum appeared to mock Plaintiff and advised him that it was "too late, this is a done deal." Dr. Crum further threatened Plaintiff not to speak to Dr. Sharma about the forced withdrawal from the course and to follow him down to the administration office to sign his withdrawal, known as "WF."   Dismissing Plaintiff in such a manner was substantively improper and procedurally improper pursuant to the Handbook. Plaintiff was forced to sign a "WF" for Epidemiology as MUA staff working in concert with Dr. Sharma, Dr. Crum and Amy Lecain (Registrar at MUA's Massachusetts office) summarily dismissed Plaintiff from the Epidemiology course without his contractually obligated rights to understand the reason or provide an iota of evidence alleging or showing he missed 'too many classes.' Furthermore, he was threatened by Dr. Crum not to speak to his instructor Dr. Sharma about the matter as is required and clearly spelled out in the Handbook on page 8. Plaintiff has not even been afforded a makeshift or sham 'due process' hearing which is typical when an individual of authority is determined or set on dismissing a student from a course or a program.

Immediately Plaintiff reviewed the Handbook still believing that his dismissal may have been mistaken identity or a good faith error by MUA administrators. As such he used his best efforts in interpreting the grievance procedure laid out in the Handbook. To that end, Plaintiff emailed MUA Executive Dean, Dr. Gordon Green and advised him of the aforementioned circumstances. Rather than receiving a response from Dr. Green, Plaintiff received and email from Registrar Amy Lecain.  Lecain berated Plaintiff on why he would email Dr. Green, further, she told Plaintiff "not to expect a response from Dr. Green and that Plaintiff needed to follow protocol and email the course instructor (Dr. Sharma) and Dr. Crum. Plaintiff tried to plea with

her that on the face of the dismissal he didn't miss 20% or more which is the standard for being forced out of the course, he pleaded with LeCain who in a very condescending tone advised Plaintiff that her "system shows more than 20%." Plaintiff replied that he has the class attendance sheet and not only did he miss only one three classes (two of which were excused by MUA as medically justified), there were multiple students who missed the same amount of classes and several other students who missed substantially more **(Exhibit D).** Shock set into reality for Plaintiff who was not only distraught by the reality of his course dismissal but he received several text messages and emails from fellow students who witnessed/heard of the spectacle of his removal from class as they inquired as to why and how he was forced out of Epidemiology.

After not receiving any acknowledgement from Dr. Green, Plaintiff on May 25, 2017 emailed Dr. Sharma with a cc to Dr. Crum as instructed to by Amy Lecain. To date, neither of the aforementioned three staff members purported to be the appellees' in the Handbook procedures have even acknowledged receipt of Plaintiff grievance/appeal let alone addressed the obvious error. This is especially compelling because the day (May 23, 2017) Plaintiff was removed from the Epidemiology course he was slated to take his midterm exam which he forcibly missed when removed. Plaintiff believes that the failure to reply by MUA and its staff to address his grievance/appeal is intentional knowing that the final exam and conclusion of the course occurs on June 1, 2017. In other words their intent is to administer and subsequently reply to Plaintiff's grievance and appeal after the course is completed rendering a reversal effectively meaningless knowing the course and the final exam conclude on June 1, 2017. This would cause Plaintiff to lose an entire semester in order to 'redo' Epidemiology and fall behind his classmates, suffer further indignation amongst his peers and a permanent "WF" on his transcripts

which are effectively a death penalty for a U.S. medical residency match, especially for cardiology.

Given the lack of acknowledgement of Plaintiff's grievance/appeal within MUA as well as the elongated process listed in the Handbook (Dr. Sharma is the first step followed by an appeal to Dr. Crum), Plaintiff has no alternative but the court for redress. Dr. Crum made it unequivocal that he would not reinstate Plaintiff, the next step is the Promotions Committee, then the Dean of the School of Medicine (Handbook p. 7). The Promotions Committee step alone not including the final step involving the Dean of the School of Medicine (Dr. Gordon Green) will not occur prior to June 1, 2017 and not likely for months. Even if they reversed their decision (nothing indicates they will do so) in the coming weeks, it will be after the Epidemiology course is concluded, rendering any decision to undo the wrong committed onto Plaintiff untimely and effectively meaningless.

Defendant cannot present any evidence whatsoever, not a shred of a 'paper trail' in order to justify the permanent dismissal of Plaintiff from Epidemiology. In fact, to date no response from MUA to Plaintiff's grievance, despite the fact he has clearly pointed out not only that he missed less than 20% of the class, Plaintiff by displaying MUA's own attendance record showed how other students in the same course had significantly more absences, one student missed eight classes, two missed six classes and eighteen students missed more classes than Plaintiff and remain in the course today **(Exhibit D).**

Plaintiff is unaware of the motivation for what is clearly an unintentional error or a pretextual course dismissal. MUA's staff, especially Dr. Crum and Amy Lecain have made a spectacle out of Plaintiff's ordeal to the point that several students are talking about it because

they can see the Epidemiology class roster along with the official attendance marks. Rather than correct the record, Defendant and its agents appear to be taking the 'bunker mentality' to cover for their failed leadership and unethical/incompetent behavior. Among other items absolutely not in dispute are the following:

A.) That as of this moment, it is not only Plaintiff's claims that he only missed three courses but MUA's own records reflect the same.

B.) Within the same course and exact class, record **Exhibit D** shows 21 students of the 85 have the same or more absences than Plaintiff whom all remain in the course but for two.

C.) Undersigned counsel sent a letter to Amy Lecain who purports to be the central command of such issues per phone call with Plaintiff, undersigned counsel was met with disdain and obstruction from Lecain as he simply inquired into whether or not he could speak to MUA's legal counsel in order to avoid the litigation at hand.

D.) Although Plaintiff is contractually entitled to miss courses for any reason so long as he attends 80% or more, Plaintiff suffered from significant stomach pain that led to bowel movements causing blood in his stool. This fact was documented, approved by MUA and occurred prior to his sham dismissal from Epidemiology by Defendant.

E.) If Defendant believed Plaintiff had excessive absences, why would they not send him notice of the same or provide what dates allegedly caused him to exceed the limit? Why would they wait for Plaintiff to appear for his midterm exam, check in and then proceed to remove him from the course?

Perhaps most egregious is the fact that Defendant and all of its agents and employees can simply log into the course attendance sheet and confirm everything outlined in Plaintiff's cause

of action and this motion for equitable relief and see that Plaintiff's position is accurate as outlined herein and in his affidavit **(Exhibit E).** At present, no other conclusion can be drawn other than Defendant's decision to remove Plaintiff is willful, wanton and without intervention from the court will cause irrepairable harm.

The fact of the matter is that Plaintiff and other similarly situated students rely on high priced educational institutions such as MUA to honor contractual obligations, written policies, as well as rules and regulations that they promulgate. Such egregious and indefensible conduct could subject Defendant, its agents/employees to significant monetary damages. Until further information is developed, Plaintiff only wishes to rectify this matter and continue on an unimpeded path to graduation.

## IV.   LEGAL ANALYSIS

The Michigan Supreme Court has established a four-factor analysis for a court to determine whether a preliminary injunction should be ordered:

A. The likelihood that the party seeking the injunction will prevail on the merits.

B. The danger that the party seeking the injunction will suffer irreparable injury if the injunction is not issued.

C. The risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of relief (i.e., the balancing of the harms/equities).

D. The harm to the public interest if the injunction is issued.

*Detroit Fire Fighters Ass'n, IAFF Local 344 v City of Detroit*, 482 Mich 18; 753 NW2d 579 (2008). As outlined throughout this motion, the application of these factors to this case favors granting injunctive relief in favor of Plaintiff against Defendant.

**A.     Plaintiffs Will Likely Succeed On The Merits Of Its Claims.**

The objective of a preliminary injunction is to maintain the status quo pending a final

hearing regarding the parties' rights. *Michigan AFSCME Council 25 v Woodhaven-Brownstown School Dist*, 293 Mich App 143, 145; 809 N.W.2d 444 (2011).

Plaintiffs will absolutely succeed on the merits of the claim outlined in their Verified Complaint for several reasons, in fact Plaintiff can succeed on a motion for summary disposition akin to cases where a bank files an SD motion against a mortgagor who has missed consecutive years of monthly loan payments. Simply stated, Plaintiff did not miss more than 20% of the Epidemiology course as is required in order to expose himself to discipline including being forcibly withdrawn from Epidemiology. Secondly, no factual dispute can exist as to the aforementioned, because Defendants' own attendance records corroborate Plaintiff's assertions. What is perplexing and not at issue unless or until litigation on the merits continues is why MUA and its administration have permitted so many students who have substantially more class absences in the same Epidemiology course to remain in class while targeting Plaintiff for dismissal without cause or justification.

**B.    Plaintiff Will Suffer Irreparable Harm If An Injunction Is Not Issued.**

*In Re Smith Trust*, 745 NW2d 754 (Mich 2008) the court effectively reconfirmed TRO's should be limited to unique circumstances. In analyzing *In Re Smith Trust*, the court determined on how property is unique. In that case, the injunctive relief sought involved real property, which Michigan Court recognize as unique by nature, or by definition a subject matter that cannot necessarily be quantified monetarily. In Plaintiff Hashem's case, the subject of this dispute would not be unique, in other words could be quantified monetarily if it were about only a simple breach of contract and damages that would ensue as a result of the breach. However, with Plaintiff being a foreign medical student (already difficult for foreign grads to match any residency even if you are number one in your class) a forced dismissal from Epidemiology and

set back of an entire semester will cause him to slide from a slim opportunity match for a medical residency slot upon graduation to none. It is common knowledge and undersigned counsel can state with confidence that not only will Plaintiff not match a residency program he has no chance whatsoever to match in a competitive field such as cardiology. No residency program nationwide will accept someone who has been dismissed from a course such as Epidemiology for the reasons cited and must be reported by Defendant to the ACGME. After years of trial and tribulation as a student it would be unfair and irreparable if Plaintiff's medical career effectively ended in this manner, which it would without injunctive relief. Simply stated, for Plaintiff, becoming a cardiologist is a legacy that cannot be quantified monetarily, exchanged, duplicated or replaced.

Preliminary injunctions have also been granted to preserve business goodwill. *See St. Clair Medical v Christopher Borgiel*, 270 Mich App 260 (2006) and *Radio One, Inc. v Wooten*, 452 F.Supp.2d 754 (ED Mich 2006). In *Radio One*, the federal district court acknowledged the settled legal principle that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute . . . and "the loss of fair competition that result from the breach of a non-competition covenant is likely to irreparably harm an employer." *Id.* at 759 (citing *Basicomputer Corp v Scott*, 973 F2d 5-7, 512 (6th Cir 1992)). Plaintiff's dismissal, especially the manner and means used to do so, will effect Plaintiff good will even if he ever chose not to pursue a career in medicine. Evidence of that are his classmates in Epidemiology who can see the class attendance sheet and are concluding on their own that it must be 'some other reason' Plaintiff was removed from the class.

This Court should grant an emergency TRO in this instance because based on the specific facts in the Verified Complaint and this Brief, immediate and irreparable injury will

occur to Plaintiff from any delay required to effect notice or from the risk that notice itself will precipitate even more adverse action by the Defendants.

Each passing day places Plaintiff in peril of not being able to sit for the final exam scheduled on June 1, 2017. Plaintiff continues to fall behind his peers in Epidemiology and is reaching a threshold where if he is not immediately reinstated he may not pass the Epidemiology course due to so many classes missed since his unlawful removal.

**C.    A Balancing of the Harms/Equities Favors the Issuance of a Temporary Restraining Order against Defendant.**

The harm to Defendant from the issuance of a TRO will be minimal to nonexistent. Plaintiff seeks to maintain the status quo pending a final hearing regarding the parties' rights. It is not a hardship on Defendants to reinstate Plaintiff back into Residency, because if they prevail he would not be permitted to 'pass' and/or move on. In fact he would have to take the course over again and this would generate more revenue for Defendant which is clearly the primary purpose MUA and other US approved foreign medical schools exist.

Plaintiff is only seeking to keep Defendants from violating their freely entered contractual obligations. Furthermore, the granting of a TRO in this instance would be of little to no harm to Defendants.

Should the Defendant prevail in this matter, nothing would change but for a benefit to Defendants of reviewing their policy and administration of their medical program which is run in violation of several ACGME rules and administered in a half hazard, inconsistent and chaotic manner. Should Plaintiff prevail on this TRO, it would force Defendants to more closely and introspectively examine their policies and procedures to become more compliant and to re-examine the way students are removed and their grievance processes which do not comport to bare minimum levels of due process.

**D.** **The Public Will Benefit from the Issuance of a TRO**

The public has an interest in the enforcement of contracts, especially contracts involving the right to pursue an unimpeded education. This factor should weigh heavily in favor of Plaintiff given on the face of Defendant's own attendance document, Plaintiff did not exceed the 20% missed classes. Plaintiff has spent money and all of his adult life pursuing his dream to become a physician, he should not be dispossessed of his interest in any educational opportunity unjustly and without due process which he is contractually owed from MUA. Furthermore, the public has an absolute interest in how or why students in the same course, several who have missed substantially more classes remain while somehow and without explanation Plaintiff was forcibly removed. At stake here is whether or not a young man will ever be able to practice medicine in the United States regardless of his class rank, he will never overcome the "WF" on his transcript or ever be able to explain why he was held back a semester because his application will never make it to the select few who get an interview for a medical residency. Plaintiff's application will be set aside upon a simple review of his transcripts, the "WF" and semester lag will be not only glaring but also insurmountable.

The Court should grant injunctive relief in this case because Plaintiff has no adequate remedy at law for Defendant's actions and the irreparable consequences that will ensue. Education and medical residency achievement is unique, Plaintiff can never get into another residency program even if somewhere down the line Defendant's correct themselves. This is exactly the type of scenario envisaged for equitable relief.

**V.** **CONCLUSION**

Plaintiff requests that this Court issue an emergency temporary restraining order and

order to show cause why Plaintiff's relief sought should not be permanent.


Dated: May 30, 2017                    By:  /s/Mohammed Abdrabboh (P61989)
                                       Co-Counsel for Plaintiff


                                       By:  /s/Azzam Elder (P53661)
                                       Co-Counsel for Plaintiff